Good morning. May it please the court, Charles M. Bonneau Jr. appearing on behalf of appellant Richard Nuwintore. I'd like to reserve two minutes. Your honors, there is a roadmap to what we think should have been done in this case in terms of the defense counsel's function. And the roadmap appears in a decision of this court from 2002, Chang versus INS. And under Chang and under the cases which follow it, which cited it, Knutson and Alaka, and then permitted or endorsed a procedure where the defense enters a stipulated loss amount that's under $10,000, while at the same time, perhaps a higher number is actually paid in restitution. In Chang, the defendant admitted about $600 of loss amount, but stipulated to pay restitution and the amount of $20,000 to $40,000. So that's the kind of resolution that would protect the defendant from automatic removal. That doesn't seem to have become widely or universally known, despite the fact that decision in the United States Supreme Court, and this should have been part of the arsenal or part of the toolbox that defense counsel could have used. But the government would have to agree to that. Did the government ever suggest that they were entertaining that? Yes, in fact, I'd like to refer to page 11 and 12 of the reply brief, there's a letter dated November 8. I'm sorry, November 9 of 2010. And in that letter, that's about a that's a month before the plea is actually entered. The government makes a makes an offer with a stipulated loss amount of $1,029.81, which would have done the job that your client rejected that offer. So why did your client reject the offer? He wasn't informed that this was going to have a, the effect of the desired effect. No, the attorney didn't know it. He didn't know it. He didn't know it. And later in in December of 2010, he wasn't aware of it. He still it bothered him because the amount was wrong. And so he, he asked and there was there was a motion to change the loss amount. And then and then that was then he withdrew it, he still didn't know that it was going to affect his immigration status. That's the crucial element that's missing in this puzzle that we have before the court. So, you know, I'm concerned about whether he advice was given to. And I'm puzzled also, as Judge Bress has expressed what this was all about in terms of why he did not accept the lowest sum of money when he had the advice that the consequences between an above 10,000 and a below 10,000. He said he was positive he did that and did this report crediting that. So can you just clarify that for me? Is that true or is that not true? The what happened was that the defendant was advised several times that the amount over $10,000 that admitting that would result in deportation or automatic removal. What he wasn't informed of was that not admitting it would have the opposite effect that he would then not be subject to, to automatic removal. Those are not the same thing. And that's easily demonstrable. Because before the Chang opinion, everybody thought that, that these numbers could come out of could come out of the probation report. And, and then that then the INS court would be bound by it this other alternative emerged. Maybe you can just try to clarify this for me. Did counsel not advise him that there's a difference between the over 10 and the under 10? And that's what I'm really concerned about. I'm not clear that the record would be adequate. The I, the record does not establish that the defendant was told the converse, because and the reason I think we can say that is that is that Mr. Hayden Meyer expressed no awareness of this principle that had emerged gradually in the immigration law, there he's a criminal defense attorney. He did not consult with an immigration attorney. Yes, I know that he did. He did say, though, that I'm sure that he wasn't told. Well, that's, remember, the as the magistrate judge found Hayden Myers memory was very incomplete. And, and there's, there's nothing to point in the record that would suggest that he that he made that connection, which was very obscure. He said, in fact, he said that he left the immigration question to the defendant, a true case of the blind leading the blind. He, he let the defendant make up his mind about whether he wanted to take whatever unknown risk there was in the immigration consequence. He, he made an effort to contract to contact Professor Smith at UC Davis. That wasn't successful. And you can tell by his billing records, point two hours, point one hours, I don't need to tell the court that that indicates a missed phone call. It's or maybe an email. It's not you don't have a conversation like this. And in point two hours, or point one hours, he didn't have the information. He never knew it. I asked him. He said he never heard of it. So how let me interrupt again, you're telling me at the time that he's offered this plea, which would have been what $1,300 $2,000 would have at the deportation proceeding. At that time, he had no knowledge. No, was he ever told that there was a difference economy between that's correct. Therefore, he turned it down without knowing. He turned it down without knowing that that was his opportunity. And then in December, they could have gone back to the well because if this was the whole, this was the deal breaker. And and the the Lee versus United States, the Supreme Court discusses this how some defendants would be willing to spend more time in prison, if they could, or risk it, if they could maintain the their, their immigration status. So that's yes, is your position. Fast forward to December. Now, he was told specifically, that he's going to face deportation. The position is that he shouldn't have been told at that time, the opposite would be the case. scenario that was a failure to cut the advisable consequences of deportation. So to get a sense of what you're arguing. Yes, and under Padilla. That's, that's exactly right. The the, the attorney's duty extends to with to making this kind of research looking into a creative alternative. What's plan B? What's plan B here? And that wasn't done. And Padilla requires it. But what evidence is there? What evidence is there in the record that he was prepared to accept the earlier offer? Well, he well, at the time, he was uninformed. So it wasn't that that's, that's more or less speculation. Of course, now he says that getting executed in his home country was the overriding concern. So of course, he would have taken it. It's, it's the time he's given that better plea offer. I don't know what the concept of your position is. Yeah, to the contrary, the letter from the US attorney, that's the only that's the only written record that we have. And it states that the he would be deported either way, no matter what he admits as far as a loss amount. That's the only advisement that we know that he was given that this loss amount doesn't really affect his immigration status. That's, that's what that November 9 letter says. So in this, in your position ultimately is that in December, Padilla wasn't really complying with it because he wasn't giving the price of the consequences of it. That's correct. This was defensible on the on the loss amount. And had it been defended, or at least negotiated, then the result would have been different. And I think it would have, I think it's entirely plausible. This is not something where we have to say this was pie in the sky, or, you know, maybe the government would have offered it. And maybe they wouldn't, if they did offer it. So we're right, we're right in the ballpark. We're in the area where Padilla says, you have to follow up on this stuff. Realistically, there really is substantive difference between how the immigration authorities assess the under 10 and the over 10. Well, the, uh, Nijuan, and the cases that it cites, including Chang, make it clear that this has to be established by proof somewhere. It can't just be an empty allegation. The loss amount has to be proven, either in, either in the state, or the local level. The, um, district court or in the immigration court and the, um, the Nijuan decision at page 42 makes a, um, makes the point that, uh, the petitioner and those in similar circumstances have at least one and possibly two opportunities to contest the amount of loss. The first at the sentencing and the second at the deportation hearing itself. Now, the, the opposite is also true. The government, those are the government's opportunities to prove it. And there, the, and, and, uh, to not prove it, they can, uh, they can force the, uh, the defendant to admit it. That's what was done in this case. Okay. That shouldn't have been done. The attorney should have prevented it. Well, uh, we've gone over on the time. We'll give you a minute for rebuttal, but why don't we hear it from the government at this point? Thank you very much. Thank you, Your Honor. May it please the court, Brian Fogarty on behalf of the United States. The district court's two conclusions. First, that defense counsel properly advised Mr. Niuwentor of the significance of a loss amount above and below the $10,000 loss threshold. And second- If I can interrupt you, Mr. Niuwentor, my apologies. We're in the record. I, it seems thin to me. He says that I must have done it. I always have done it. We under-recommend that he be comfortable with knowing that he actually did advise the defendant of the difference between the above $10,000 and the below $10,000. Another way of phrasing it, it was this proper, convenient advice that was given as to the consequences of the risk of deportation, even under the circumstances of this case. Your Honor, I would refer the court to, uh, ER 154 through 160. In those pages of testimony by Mr. Hayden-Meyer, the district court properly examined the entire context of Mr. Hayden-Meyer's advice to Mr. Niuwentor. During that testimony, Mr. Hayden-Meyer said he knew of Mr. Niuwentor's immigration status from the beginning of his representation, that he had the $10,000 loss threshold clear in his mind throughout the representation, and that he made decisions during the representation with that in mind, meaning with the $10,000 threshold as the triggering point for the, uh, presumptively mandatory deportation. And my problem with that is that if really it was effective, convenient and not given that, you know, there's a difference between the above and the below $10,000, and why would the defendant not say that I'm not going to go forward with this? And to go back to the general view of things they had, that they gave me a compromise on the other proposals, excuse that, he would not want to go forward with me. I'm just looking for that, I can feel comfortable that he was properly advised that by, uh, going forward with the above $10,000 dynamics, that he was absolutely not going to have an opportunity for a more favorable outcome for the immigration authorities. I just don't see that clearly in the record. Your Honor, I would refer the court to, um, to ER 159 to 160. That's where Mr. Hayden-Meyer testified about the advice he gave Mr. Nguyen-Torre in connection with that November 2010 offer. At 159 to 160, Mr. Hayden-Meyer said he advised Mr. Nguyen-Torre correctly about the impact of pleading guilty and accepting a loss amount below the $10,000 threshold. Now, Mr. Nguyen-Torre... If the defendant had taken that, if it was so clearly told to him at that time, I mean, why would he not say, I'm going to go forward with that plea? You're telling me that he knew in November what the consequences would be and he decided not to go forward. I don't understand the logic to that. The answer, I think, Your Honor, is that the record is clear and undisputed that Mr. Nguyen-Torre was not interested in resolving the case at all until two days before his guilty plea. The record indicates that he had no interest in resolving the case whatsoever. And that's reflected in Mr. Hayden-Meyer's testimony about the motion to continue the trial at the end of, shortly before the guilty plea. It's a good question as to whether he got proper continued advice. Clearly, here's the difference. Above 10, below 10, I don't see that in the record. Your Honor, I'm sorry, I didn't mean to speak over you, Your Honor. Go ahead. Between $154,000 and $160,000, it's clear that Mr. Hayden-Meyer knew that the $10,000 loss amount was the triggering point. And then he advised Mr. Nguyen-Torre about that, meaning if the loss amount is above that, then you will be subject to presumptively mandatory removal. Where exactly in those pages does he give him that type of advice? So that I can be comfortable that he clearly told them that there was a difference. Can you just read it to me? Because I don't see it. Your Honor, I refer the court to page 159. The question posed to Mr. Nguyen-Torre at line 6, or I'm sorry, posed to Mr. Hayden-Meyer at line 6, is did you explain to Mr. Nguyen-Torre the impact that the plea offer, this is the November offer, would likely have on his immigration consequences? And Mr. Hayden-Meyer responded, I believe so. That's it. I believe so. That's what we have to go on, right? That, in addition to Mr. Hayden-Meyer's definitive testimony about his knowledge of the significance of that loss amount correction. And so I think the court should focus on the entire context of Mr. Hayden-Meyer's testimony, which the court found to be more credible than Mr. Nguyen-Torre. I believe so satisfies PD's requirement to properly advise the defendant of the risk of deportation or the consequences. I believe so. That's what I see in the record also. It's kind of thin in different parts. Your Honor, I don't, I think the testimony is, the district court probably found it to be more credible and corroborated by independent evidence. Unlike Mr. Nguyen-Torre's unsupported testimony that is inconsistent with the independent evidence that Mr. Hayden-Meyer presented at the evidentiary hearing. I appreciate the fact that you answered some of my concerns. I'm not so sure I'm satisfied with them, but that's for another day. And Your Honor, if I may just respond to Mr. Nguyen-Torre's remark, counsel's remark about the government's letter conveying the November offer. In which the government regrettably did state that the offer may result in Mr. Nguyen-Torre's removal. I think the court, the district court, properly set that statement aside. Because as this court has held in Rodriguez-Vega, the real inquiry for this court is whether Mr. Hayden-Meyer provided accurate advice about the consequences of the guilty plea. And not whether the government or the court did. And in Rodriguez-Vega, this court found that those admonitions by the court and government counsel were, quote, simply irrelevant. So unless there are any other questions, Your Honor, the government would just submit that the district court's findings, well supported in the record, were based on credibility determinations that were also supported in the record. And that district court properly found that there was no strickland error or prejudice with respect to the asylum advice as well. And the court properly denied Nguyen-Torre's formal petition. Counsel, can I thank you for trying to wrap up. Let me ask you one question. To what extent does our prior decision control here? As I read it, our prior decision back in 2017 just said, look, if the allegations are true, this would be an issue. And so it remanded it for an evidentiary. Is that correct? There was no finding or suggestion that found the district court. And then the district court made findings on remand. And now that's what brings it back up to us. Is that correct? That's correct, Your Honor. Okay. And did the district court rely on anything else other than excerpts of record that you just referred us to, 159 to 161? Well, with respect to Mr. Haydenmeier's testimony about the scope of his representation and what he knew about the $10,000 loss threshold. Right. I'd refer back to 154 through 160. Okay. And what more came into 154 that, what was the, what came in? The 150, I'm sorry. 154 is where Mr. Haydenmeier began discussing how the representation started. Meaning he knew from the beginning that Mr. Nuentor was not a United States citizen and had asylum. And that he was proceeding through the case with that in mind. And also with in mind that the $10,000 loss threshold for aggravated felonies applied. That doesn't answer the underlying question. What advice did he give to his client? Not what he knew or what he believed or what he thought about. What specifically did he say? I understand the standard for review is heightened here. All I see is what you're saying, that he believed so. Well, I'd refer back to 159 with respect to the November offer. But the evidence is even clearer, Your Honor, with respect to the offer that Mr. Nuentor ultimately accepted. Which is, Mr. Haydenmeier read aloud a letter to Mr. Nuentor. Stating that Mr. Nuentor would be deported or would be removed as a result of the December 9 offer that Mr. Nuentor ultimately accepted. And that was the offer that... There's no question about that. Clearly he told him, you're going to be removed if you take this plea. I'm not concerned, you're absolutely correct. I'm concerned about what would fall for that in this nuanced hypothetical dynamic. In any event, I don't know. All right. Hey, counsel, thank you. We'll give one minute for rebuttal. I'm going to ask you this question. We have a heightened standard of review here. We have a finding by the district court. What power do we have to complement that? I'm sorry, Lee. We have a de novo standard of review, I believe. Is it? Yes. That's my understanding. It's discussed in the briefs. And we don't think that the record supports the findings, the language that's been now focused on. And I had it open right here as Mr. Fogarty was speaking. But I can't believe I wouldn't do it. Because if that makes sense. Because in my mind, I thought the $10,000 was the aggravated felony amount. Unquote. Which it was. But that doesn't mean that you get any advantage by going below $10,000. The ordinary person, indeed the ordinary lawyer, the ordinary criminal lawyer, would believe that this was all relevant conduct. They could all come back to bite him. All he has to do is admit to the offense and the loss amount doesn't become the determinative factor. Unless you're an immigrant. And in that situation, it makes all the difference. And it's a distinct difference between criminal law and immigration law. We say that we as criminal offense attorneys are supposed to consult an immigration attorney. But we seldom see a diametrically opposed result. Which we have here. We have an advantageous plea bargain under the criminal law. But a disastrous plea bargain under the immigration law. Thank you. Thank you, counsel. The case is submitted.
judges: R.nelson, Bress, Block